We have five cases in the calendar this morning. Two patent cases from district courts, a trademark case from PTO, employee case from the MSPB, and claims case, court of federal claims. That is being submitted on the briefs and not being argued. The first case is Cleveland Clinic v. True Health Diagnostic 2018-12-18. Mr. Rosenberg. May it please the Court. Far from being conventional, as the PTO found the prior art taught away from the claimed laboratory methods in this case. The district court ignored that, and its ruling should be reversed for two reasons. Sounds like 103. Well, there's certainly overlap, Judge Luria, as I think a number of judges of this court have noted between Alice Step 2 and 103 analysis, and in this case, the district court committed two errors with regard to Step 2. The first was that there were material issues of fact in dispute, and under this court's rulings in Berkheimer and Atrix, they should have prevented judgment on the pleadings. Look, look, the claimants are contacting a sample with an antibody, spectrophotometrically detecting, which is not really a transformative step, and then comparing. Comparing and identifying. These sound pretty abstract, and they're not much different from the previous case. Well, I think they are very different, Judge Luria, from the previous case. First and most critically, these are laboratory method claims. They do not include a diagnosis or prognosis element like the claims in the Ohio case and like claim, excuse me, example 29, claim 2 of the PTO guidelines. These are like example 29, claim 1 that are almost identical to the claim in the 065 patent that's at issue here. But example 29 is maybe your best argument, but that is not binding on us. It isn't binding, but what it does deserve is Skidmore deference, and the court failed to do that. The court, in its analysis, stated that the standard for deference was the standard for Chevron deference, publication in the Federal Register and notice and comment, not the standard for Skidmore deference. And we don't believe that the district court gave the guidelines or the PTO's interpretation of the guidelines Skidmore deference, and that's particularly relevant with respect to step 2 of Alice, because the PTO carefully analyzed the guidelines, the prior art, and held that these claims were innovative, were certainly not conventional or routine. And the district court virtually entirely ignored that in its opinion. The only time it even mentions the prior art is a summary footnote saying that it didn't think the prior art found these things innovative, never analyzed what the PTO had said. It never went through the Skidmore analysis of determining how persuasive the PTO's analysis was, why it should or shouldn't be relied upon, and how it applied in this case. At least at step 2, Judge Lori, the district court didn't do what it was supposed to do under Skidmore, and given that the guidelines are entitled to Skidmore deference, we believe that is a reversible error in and of itself. There were plainly material issues of fact about whether these laboratory methods used for this purpose were conventional or routine. Kennedy. In the blue brief at 56, you say the methods claimed in the MPO lab method patents do not simply observe or detect a natural law. The correlation identified by the Court depends upon the techniques used to measure MPO. Yes. And in the at 49, you say whether the detected MPO will be elevated depends on the techniques used to detect it. Yes. Even when using the prior diagnostic test, do you agree that MPO levels are in fact elevated in a patient at risk of cardiovascular disease, but the prior test simply would be ineffective at detecting? No. I don't agree with that, Judge Wallach. Because what the prior art taught and was so critical here is that you can look at MPO a variety of ways, and in most ways you look at it, you're going to find MPO in the blood lower in patients who are having cardiovascular disease or cardiovascular events. When you use this technique... But it's still up there, right? Not necessarily. This technique simply gives information that a physician or an ultimate diagnostician can use to try to make treatment plans. It's not 100%. It's very different from, like, the DNA cases like Ariosa, where it's either there or it isn't. Here, in some patients, MPO never gets elevated, no matter what their risk of cardiovascular disease is. It's definitely not an all-or-nothing thing here. And all this is doing, and I acknowledge this is not a method of treatment claim like the Vanda case, but it's similar, because this is not an all-or-nothing proposition. And what these laboratory patents do, unlike the Ohio patents, which have the diagnosis element, these simply give physicians the information they need, along with a whole lot of other information about an individual patient, whether to prescribe diet and exercise, medication, invasive procedures. So your argument helps you in getting away from the laboratory techniques of the previous patent and saying this provides information. Yeah. That's hardly helpful when the issue is abstract idea or law of nature. Well, it is helpful, because the technique itself is innovative for this purpose. It's very much like the exergen case, we believe. In the exergen case, there was... This is just the same technique that's been used for a million other diagnostic kits. You just figured out that it's useful in determining elevated MPO, right? With respect, that's not quite true, Judge Moore. Is it the spectrophotometric detection that's innovative? Where is the inventive portion of the process here? So a lot of it's in the specification. No, in the claim. It's the combination of the elements. And the combination of the elements, when you look at even the detecting the antibody and contacting it, when you look at the specification, it talks about the way the ELISA, which this relates to, was done. At page 1751 of the appendix, for example, there are statements in the provisional application... Doesn't the spec say MPO activity may be determined by any of a variety of standard methods known in the arts? Is that a call from the spec? Yes, in the summary of invention, yes. But that doesn't relate to the specific lab method claims at issue here. And in the Ohio case, you didn't have specific lab method claims like these. These are much more detailed, have step-by-steps analysis of the method. The point is, the ELISA in this case was custom-made after many months of research. And the only reason that isn't clearly established in the record is because there was no factual development. But it explains that in the provisional application. There's more statements about that in the specification. I'm sorry, what's the language in the claim that you, either of the 065 or the 597, that you're claiming is this innovative aspect? Because this just seems, on all fours for me, with whether it's Ariosa or Mayo, I mean, this is just a diagnostic kit, and I don't see anything different. And your spec itself says you're using standard prior art methods to do these things. So I really don't see anything. Tell me precise language in the claim and why that is really pointing to something that is innovative, apart from the abstract idea itself, which can't be the innovative thing. Right. So first of all, in the 065 patent, it's the steps of obtaining the plasma sample, detecting elevated energy. Give us a reference. So I'm talking about claim one of the 065 patent, right? So claim one talks about obtaining the plasma sample from the human patient, having arteriosclerotic CBD. That itself is something that was taught away from in the prior art. The prior art said that's going to be worthless. Then you detect an elevated MPO mass in the plasma sample. That also, taught away from by the prior art. And then you have the control methodology to control against the general population or apparently healthy subjects. And the spec explains that that control methodology, in example one of the specification, is done through this iterative process. I'm sorry. Where is the control methodology in claim one? I don't see that. It's in claim 1B. It talks about as compared to a control MPO mass level, and that control MPO mass level is discussed in the specification in example one. And the methodology in example one uses this iterative process where you take, in this case, thousands of samples analyzed through this lab method to create a control curve. Aren't you just detecting whether something's elevated by comparing it to a control? What am I missing? No. It looks like you've just chosen a control level, and you're comparing it, the sample you have, to decide if it's more higher than the control. Yeah. But the control methodology is explained in detail in the specification, and the way it has to be done to be effective is to actually use a very significant number of samples with this particular lab methodology to create the control curve. It's not something that exists out there. It's not a preprinted reference. It's not a standard reference, and it varies through time. As you get more and more samples, the control methodology changes, and example one in the spec explains all of that. So just there, each of the different elements may, in isolation, be conventional, but the combination and using it for this purpose was distinctly taught away from by the prior art. And so in that case, it's not routine and conventional. And explaining judge more or understanding each of these elements, how they fit together, and what an ordinarily skilled artisan would understand is why factual development was necessary. Maybe this is a case that could have been disposed of at summary judgment after there was expert testimony and there was a full record that was developed. But this was done at the pleading stage, and it was done because the district court misinterpreted this court's decision in the Ohio case as resolving any and all issues. But these are lab method claims. They are different. As the court in the Ohio case specifically said, that lab method claims may be treated differently from diagnosis and prognosis claims. The PTO guidelines do the same thing in example 29. They treat claim one and claim two very differently. I guess I'm struggling to understand or appreciate what about claim one of the 065 patent is somehow a lab method claim as opposed to simply a diagnostic kit type claim? Because there's no diagnosis element to it. Wait, aren't you diagnosing an elevated NPO mass? No. Is that what you're diagnosing? No, you're detecting an elevated NPO mass in patients that already have been diagnosed as having CVD. There's no diagnosis element here. I fail to appreciate the difference between detecting and diagnosing. You're detecting elevated NPO mass because you found that correlates to something important. You're detecting NPO mass because it gives information to the physician that the physician can use for treatment, but it's not diagnosing a condition. It's not saying you have CVD because of this. Wait, when you are diagnosing pregnancy in a woman, you're detecting an elevated level of a certain hormone. That's the way the claims are drafted for diagnosing pregnancy in a woman, elevated level of a particular hormone. Why isn't that exactly on all fours with this? You're not technically diagnosing pregnancy. In fact, the claims don't say that. The claims say diagnosing an elevated level of, I don't remember the name of the hormone, but a particular hormone. Why isn't that on all fours with this? Because in that circumstance, you're using the hormone to diagnose the condition that exists. Here, the condition already exists. Every patient that's tested already has CVD. Every patient that's pregnant already has an elevated level of hormone. Yes, but the purpose of those claims is to figure out if the patient is pregnant or not. The purpose here is not to determine if you have CVD or not. It's to determine what the level is so the physician can decide the treatment. It's fundamentally different, and I really urge the court, if you look at example 29 in the PTO guidelines, the differences between claim one and claim two make this very clear. If it doesn't have the diagnosis or prognosis element, it's not directed to a patent-ineligible subject. I want to get a quick housekeeping question in. Yeah. TrueHealth argues that CCF never proposed a specific or concrete claim construction. In the gray brief at note eight, you say you did, but when I look to what you cited, I don't have specifics. What claim terms did you identify as needing construction and where in the record? Right. So we identified a number of terms as needing construction, and in pages 35 and 36 of our blue brief, and I believe in the footnote there, we explained some of the terms that do, and they were also raised to the trial court in the briefs in the trial court, and the point there was we never got to claim construction. So we didn't propose an elaborate construction of the claims. We said these claims require construction in the context of this case to understand what a skilled artisan would understand, and the district court never got to that point. You wanted to save some time, and it's almost exhausted. Yes. I'll give you two minutes for rebuttal. Thank you, Your Honor. Thanks for the answer. I'm sorry for aiding your time, but I want to thank you. Mr. Matrip. May it please the Court? I think it would be appropriate to pick up on Your Honor's question regarding the claim construction issue and whether the claim construction issue was raised. There were claims cited and broad statements made that claim construction was required, no different than the first appeal in this case, and in this Court's decision in the first appeal, it was made very clear that simply invoking claim construction or identifying terms without proposing a claim construction and explaining how it may lead to a different conclusion is insufficient. I mean, here on this record, the claims aren't even identified. It's boiled down to the basic proposition that as long as the terms claim construction or expert testimony are interjected in the district court. I want to ask you some skidmark questions. Yes. In the red brief at 42, you say that any failure by the district court to recognize that the guidelines may warrant a skidmark difference is harmless error. Is it your position that the eligibility guidelines are not afforded skidmark difference, or are you only arguing that example 29 lacks persuasive force? Both, and I don't think the result changes. I think whether they're, you know, in this instance, it's not statutory construction of an ambiguous statute. Well, whether it changes or not, I want to get to whether we do. Sure. The court erred below by not providing it. And you say both, so it seems to me you're challenging skidmark difference. No.  I mean, given that the statute, given that the exclusions, the exceptions, abstract idea, natural law, natural phenomenon, are not in the statute. They're judicial creations. Given that the two-part test for determining patent eligibility is based on Supreme Court precedent, it doesn't neatly fit into the Skidmore dynamic where the idea behind Skidmore is that when an agency is charged with administering a statutory regime and the statute is ambiguous, their construction of the statute should What about Carnegie Mellon v. Hoffman LaRoche? We didn't cite Skidmore, but we held similar guidelines were persuasive authority. Yeah. This court has treated the guidelines by providing notice and reviewing the examples, making a determination in some instances that the examples are analogous in some instances they are not. This court has addressed the guidelines in the context of 101 utility, patent eligibility, and 112 written description. That's precisely what the district court did here. The allegation has been made that the district court ignored the guidelines or ignored the prosecution history. But in the court's order, it specifically discussed the examples that are part of the guideline. It states in the footnote where it describes, where it cites Christensen, it cites Skidmore, that it disagreed with the patent examiner's analogy. And then it goes on to explain why it disagreed with the analogy. The district court rightly found that example one, or example 29, claim one was inept. That claim is directed to simply detecting a protein in a sample. Now, these claims, there was an attempt to draft the claims here in light of the first case, Cleveland Clinic one, on example one, but they couldn't get there because in the specification there are admissions that there were techniques already available and used in the field to detect MVO plasma or activity in blood. So they couldn't draft the claims directly on the example. These claims are analogous. These claims are methods to detect elevated levels in the blood of patients having atherosclerotic cardiovascular disease. They're attempts to observe, or they are claims to observe, the natural law. Whether they're nominally drafted as laboratory methods, which we disagree with, laboratory methods as we understand them, as was described in this court's opinion in the first appeal, are spectrophotometric testing or immunoassay testing using antibodies. What's the natural law? The correlation between elevated MPO levels in the bloodstream and cardiovascular disease. So whenever there's CVD, there's always elevated MPO? Because that seems to fly in the face of the conventional wisdom. It may be that conventional wisdom taught away from the discovery, but that the discovery of the natural law is that elevated MPO levels in the bloodstream, free circulating in the bloodstream, correlate to CVD. There's been some discussion here about the prior art teaching away. Well, there were attempts to look at other... Because you're directly contradicting opposing counsel and my memory. Do they always correlate with CVD? There were attempts looking at other bodily samples, measuring in tissue, measuring indirectly intracellular levels where the prior art may have suggested that the correlation was less clear. There are references in the briefs that the patentees were the first to see the correlation. Well, what they did was they started with certain bodily samples and tests, and through an iterative process they arrived at, if we focus on free circulating MPO in blood and we measure mass or activity, that's the correlation, that's the correlation that's discovered, that's how you see the correlation. That's the same iterative process that's involved trial and error in any scientific discovery. It's the same arguments that were rejected in Myriad where the patentees attempted to argue in the iterative scientific discovery process into the claims when it's not part of the analysis. So correct me if I'm wrong, but what you're saying is it's always elevated in persons with cardiovascular disease. It just wasn't determined. It had not been discovered that patients with cardiovascular disease had elevated free circulating MPO levels. Always. I haven't seen scientific studies that indicate it's always or with the degree of cardio, but as stated in the specification, the discovery was that patients with coronary artery disease, CADs, cardiovascular disease, had elevated MPO levels in their blood compared to apparently healthy patients, normal patients. Your biggest problem, I think, is example 29, right? I would disagree, Your Honor. I think that the district court... If detecting, comprising, obtaining a sample and detecting whether there's a binding there, that's these claims, right? No, I would disagree, Your Honor. I believe that these claims are directed to detecting the natural law. Example 1, 29 claim 1 is a basic laboratory technique. You're detecting a protein in a bodily sample. That's where it begins. That's where it ends. Those types of claims are directed to the underlying assay. They may be sufficiently inventive to pass through the 101 analysis at step 1. Here, again, based on what existed in the art, those types of basic laboratory techniques could not be claimed. What was claimed instead is a method to observe the natural law. Upon physical inspection, practitioners can't predict or determine if a patient with cardiovascular disease has elevated levels. So these are the basic antecedent steps that are necessary to observe the natural law, and this court has routinely stated that claims which merely recite, observe, or state a natural law without an application fail to satisfy the 101 test. That's what we have here. If the claims were limited to detecting MPO in the blood, they may be analogous to the example, but the district court was right in distinguishing the example from these claims. The district court, oh, no, was not bound by the examiner's determination. Any deference to the patent office's analysis of the examples is captured by the presumption of validity under Section 282. And again, the district court treated the guidelines as this court has treated the guidelines, gave them notice, analyzed the PTO's interpretation, analyzed the examiner's analysis, and found it was unpersuasive and an inappropriate analogy. And the guidelines themselves state, and this is at Appendix 1151 and 1153, that these are illustrative. They are general examples, that they are specific to the facts of those examples, and that other claims need to be interpreted independently. And that's what happened here. So you're not challenging the lawfulness of Example 29 as a guideline to interpret Section 101 under Supreme Court precedent? I think that there are serious questions, or there are questions about how much difference to give the guidelines, given that the case law is being developed by the Supreme Court and this court. The most recent guidelines published by the PTO, which I believe came out this week, make very clear that the guidelines are PQ interpretations of Supreme Court and Federal Circuit precedent. They're following the case law development. So I think that puts the guidelines in sort of a gray area, how much deference should be afforded them, given that ultimately this is a court-created doctrine, and the courts are interpreted how to apply 101. But nonetheless, in this case, the court went through the necessary process of taking notice of the guidelines, analyzing the guidelines, and distinguishing them and explaining why they're distinguishable. Now, in the end, at Step 2, the debate really, the argument really, boils down to, well, all the underlying techniques may be conventional, routine, and well-known.  No, Your Honor. And in Example 29 of the PTO's guidance, isn't it clear that that is that what has been discovered there is a method of detecting a newly discovered protein? So this is a method of identifying a protein. Isn't it true that in Example 29 of the PTO guidelines that protein was not known, according to the example? According to the example, according to the limited information. That's not true here, is it? No, it is not. In this case. And there were already techniques available. Is it possible that what was being claimed, or what the PTO was saying was eligible in that instance, is when you discover a new protein, if there are many different ways of detecting proteins and not all of them work, you can figure out that it is possible that it could be eligible, the method of detecting this protein, which wasn't known before, and thus we aren't sure how you could detect it. So it's the method of detecting that protein, because the protein was unknown and there are many different methods, some may work, some may not. Here we have a known protein and a known method, right? That's why it's not analogous to Claim 1. I'm sorry, I didn't hear you say that before. That's why I just wanted to ask you whether you agreed with that. Is that possibly a basis for distinguishing, even if the PTO is right about Example 29, for example, is that a potential basis for distinguishing this case for eligibility purposes from that one? I think it is. I think part of the problem with the example is that there's not enough information. I mean, the Step 1... Do you think PTO's Example 29 on its face is wrong and that if we had exactly that case, we should not find, as they suggest, eligibility? I think that if the only purpose of measuring JUL was its ability to predict jelitis, and there were statements in the specification, for example, that said our contribution to the art, our advancement over what was done previously, was this discovery, and now we're reciting the lab method, that taking all of that into consideration, Claim 1 itself could be problematic under other facts. Here, as interpreted, it's simply a laboratory assay or method to detect a protein. It's not interjecting the natural law. Now, for example, if the claim had been written, a method to detect patients having jelitis by measuring JUL in the bloodstream, pretty close to what we have here. I mean, then you're using the detection to observe the natural law. The natural law is the focus of the claim. It's not the underlying laboratory technique. It's we want to observe the natural law. These are the necessary steps we need to get there. And at that point, they're focused on the natural law, and there has to be some application, some integration of the natural law into a method of producing things, or into a method of treatment, or a novel assay, a improved anti-MPO antibody that detects or binds to MPO and plasma with greater affinity and detects with greater specificity. Those are all the potential types of claims that might have been drafted once the inventors discovered the natural correlation here, the natural law, but they stopped at here are the antecedent steps that need to be taken just to observe it. And then you stop. The product of the claims is merely observing the natural law. And so when we get to step two, the district court accepted the argument that this was the first time these well-known techniques had been applied to this natural law. But at step two, the natural law has to be divorced from the analysis. It has to be treated as part of the prior art. And that argument was rejected by this court in Ariosa, and it was rejected by this court in Genetic Technologies. Do you disagree with your opposing counsel that the changing sample size impacts the discovery? No. This court addressed the statistical techniques cited in the specification and used in the Perron patent and used here in its prior decision. The sampling techniques, the statistical techniques used were conventional. And to the extent there are arguments being made about a study needs to be sufficiently powered to provide medically relevant data, I mean, that's not part of the claims. And the underlying techniques they used that this court previously found, the same techniques claimed here are conventional. Thank you. If there is nothing further, we'll be rebuttaled from Mr. Rosenberg. A few brief points. First of all, in response to Judge Moore's question, I think the question about whether the protein is new conflates the step one and step two analysis of Alice. What the PTO is saying in the guidelines is, is this directed at step one to a natural phenomenon? And if it's a lab method to detect a protein, it's not. Whether the protein's new or novel is a step two analysis. And at step two here, I want to emphasize, the prior art absolutely taught away from this method of analysis. It taught away from using these lab methods. It taught away from measuring MPO in blood plasma as being medically significant. And the district court entirely ignored that. That leads us into the Skidmore point. I agree, Judge Lurie, that example 29 is critical here, both at step one and at step two. And while my opponent is right that the district court did discuss a little bit the guidelines with respect to step one, there was no discussion of what the PTO did with the guidelines or the prior art at step two. None in the district court's decision. That's reversible error. Third, when you actually look at the state of the art, I want to emphasize, the specification and if there were factual development, the facts would have shown that there were years and years of research by the leaders in the field in MPO research before they ever got to these methods. They tried MPXI for years. They looked at the prior art references that had looked at blood plasma and found that MPO could not be measured in any way that was significant. I would emphasize to the court, I'm not aware of any life sciences case where this court has upheld a section 101 dismissal on the pleadings where the prior art taught away from claimed laboratory methods. And finally, I would just like to mention the PTO guidelines that were issued this week for notice and comment reaffirm their view that their prior analysis in the life sciences area is valid. Example 29 has not been changed at all since it was promulgated by the PTO. Thank you very much. Thank you, counsel. We'll take the case under advisement.